ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

SEP 17 2002
CLERK, U.S. DISTRICT COURT
By ______ Deputy

UNITED STATES OF AMERICA, *ex rel.*,
ANN GAY and JAYNE McCABE,

Plaintiffs,

v.

LINCOLN TECHNICAL INSTITUTE, INC.,

Defendant.

Civil No. 3:01-CV-505-D

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

I PARTIES .......... 1

II JURISDICTION AND VENUE .......... 2

III PRELIMINARY STATEMENT .......... 3

IV SERVICE OF PROCESS UPON THE UNITED STATES .......... 4

V CONDITION PRECEDENT .......... 4

VI IDENTIFICATION OF PARTIES .......... 4

VII INSTITUTIONAL ELIGIBILITY .......... 7



30

| | | |
|---|---|---|
| A. | The Program Participation Agreements ("PPA") | 9 |
| VIII | PROGRAM PROCEDURES | 10 |
| IX | SUMMARY OF CLAIMS | 14 |
| A. | Implied Certification | 15 |
| B. | False Certification of Compliance | 16 |
| C. | Fraud in the Inducement | 20 |
| D. | Materiality | 20 |
| X | DAMAGES TO THE UNITED STATES | 21 |
| XI | WILLFUL AND INTENTIONAL CONDUCT | 22 |
| COUNT 1 | FALSE CLAIMS ACT VIOLATION (§ 3729(a)(1)) | 23 |
| COUNT 2 | FALSE CLAIMS ACT VIOLATION (§ 3729(a)(2)) | 24 |
| COUNT 3 | FALSE CLAIMS ACT VIOLATION (§ 3729(a)(7)) | 24 |
| XII | RELIEF REQUESTED | 25 |
| | JURY DEMAND | 26 |
| | CERTIFICATE OF SERVICE | 27 |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.*, ANN GAY and JAYNE McCABE, | : | Civil No. 3:01-CV-505-D |
| Plaintiffs, | : | |
| v. | : | |
| LINCOLN TECHNICAL INSTITUTE, INC., | : | |
| Defendant. | : | |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

TO THE HONORABLE JUDGE OF THIS COURT:

## I. PARTIES

1. Relator ANN GAY ("Gay") resides in Bedford, Texas. Gay brings this action for violations of 31 U.S.C. § 3729(a)(1), (a)(2) and (a)(7) for herself and for the United States Government pursuant to 31 U.S.C. § 3730(b)(1). Gay was an admissions representative at Lincoln's Grand Prairie campus during 1999 - 2000.

2. Relator JAYNE McCABE ("McCabe") resides in Houston, Texas. Ms. McCABE brings this action for violations of 31 U.S.C. § 3729(a)(1), (a)(2) and (a)(7)

for herself and for the United States Government pursuant to 31 U.S.C. § 3730(b)(1). McCabe was an admissions representative employed by Lincoln's Grand Prairie campus during 1999 - 2000, who resided in and recruited students from Houston, in the Southern District of Texas, to attend Lincoln's Grand Prairie campus.

3. Defendant Lincoln Technical Institute, Inc. ("LINCOLN") is a corporation with its principal place of business in West Orange, New Jersey. The events relevant to this action transpired at all fourteen (14) Lincoln campuses pursuant to the policy and procedures of Lincoln's management and board of directors. Lincoln waived service of process and has made its appearance herein.

## II.
## JURISDICTION AND VENUE

4. This action arises under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

5. This Court has jurisdiction under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331. This action arises under the laws of the United States.

6. Venue is proper in the United States District Court for the Northern District of Texas, Dallas Division, pursuant to 28 U.S.C. § 1391(b), (c) and (e), and 31 U.S.C. § 3732(a) because Defendant Lincoln transacts business, and numerous acts forming the basis for this Complaint occurred, in this District.

## III.
## PRELIMINARY STATEMENT

7. *Relators* sue on behalf of the United States to recover all federal educational grants and all federally insured educational loans, including but not limited to defaulted loans, made to students who attended Lincoln proprietary schools in the United States for the period between fiscal years 1994 to 2001. Almost 80% of Lincoln's revenues for fiscal years 1994 through 2001 was derived from federal student financial assistance programs made available under Title IV of the Higher Education Act of 1965 ("Title IV, HEA Programs"). Lincoln Technical Institute, Inc. made false certifications of compliance, both express and implied, to the United States Government that is was not paying commissions and other incentive compensation to its recruiters, when it fact it was paying such commissions and other incentive compensation administered through its enrollment quota program for recruiters. This conduct was in direct violation of the terms of the Program Participation Agreements with the U.S. Department of Education, and federal statutes and regulations governing eligibility to receive Title IV, HEA Program benefits. Lincoln made these false certifications, false statements and fraudulent inducements for the purpose of obtaining Title IV, HEA Program grants and guaranteed loans from the Government.

## IV.
## SERVICE OF PROCESS UPON THE UNITED STATES

8. Pursuant to the provisions of 31 U.S.C. § 3730(b)(2), service of process was made upon the United States in accordance with Rule 4(d)(4), Fed.R.Civ.Pro. and the United States had appeared herein.

9. Pursuant to the provisions of 31 U.S.C. § 3730, Relators' Complaint was originally filed *in camera*, and service of process upon the Defendant was deferred pursuant to 31 U.S.C. § 3730(b)(2). The United States has made its appearance in this case, and declined to intervene. The Court ordered this file to be unsealed and to proceed, and Defendant waived service of process and has appeared herein.

## V.
## CONDITION PRECEDENT

10. Relators have direct and independent knowledge of the information upon which this suit is based. Relators have heretofore complied with the provisions of 31 U.S.C. § 3730(b)(2) by providing disclosure of substantial material evidence and information to the United States Attorney for the Northern District of Texas.

## VI.
## IDENTIFICATION OF PARTIES

11. The United States Department Of Education ("Agency") is an agency of the United States of America. The Agency is responsible for regulation and

administration of the federal student financial assistance programs authorized by Title IV of the Higher Education Act of 1965, as amended ("Title IV, HEA Programs").

12. Lincoln Technical Institute, Inc. is a private, for-profit, corporation that operates twenty-one (21) vocational school campuses. Each location meets the principal criteria of a "proprietary institution of higher education," (or a "branch" institution) under 20 U.S.C. § 1002(b)[1].

13. Lincoln executed the following Program Participation Agreements ("PPA") with the Agency during the relevant time period.[2] All PPAs were signed on Lincoln's behalf by P.J. Santangelo:

<u>OPE ID Number</u> #00736600 (Pennsauken, NJ)
This school closed on 8-30-01
PPA executed on 8-19-91
PPA executed on 11-21-97 (Exp. 9-30-99)
PPA executed on 8-31-99 (Exp. 6-30-03)

---

[1] An institution may receive no more than 90% of its revenues from Title IV, HEA Programs, referred to as the "90/10 rule."

[2] The Agency may grant either full or provisional certification to an institution that meets the requirements to receive funds the Title IV, HEA Programs. Each campus is treated as a separate institution. A campus that has been in business for less than two years may only receive Title IV, HEA Program certification as a "branch" of another institution. The Agency is required by statute to assign an identification number to each institution, referred to as the Office of Postsecondary Education Identification Number ("OPE ID Number"). *See* 20 U.S.C. § 1094b. A branch campus uses the OPE ID Number of its parent institution. The OPE ID Number is used as the tracking system for all Title IV, HEA Programs, and is the mechanism for giving notice of an institution's eligibility to participate in the Title IV, HEA Programs to private lenders and guarantee agencies who participate in the federally-assisted loan programs.

<u>OPE ID Number</u> #01246100 (Edison, NJ)
PPA executed on 1-7-94 (signed on 1-3-94)(Exp. 6-30-95)
PPA executed on 11-20-95 (signed on 11-10-95)(Exp. 7-31-98)
PPA executed on 12-12-97 (signed on 10-7-97)(Exp. 7-23-01)
PPA executed on 9-29-99 (signed 8-23-99) (Exp. 6-30-03)

<u>OPE ID Number</u> #02361900 (Oak Lawn, IL)
School closed on 10-26-01
PPA executed on 8-19-91
PPA executed on 12-29-97 (signed on 10-21-97)(Exp. 9-30-99)
PPA executed on 8-30-99 (signed on 8-23-99)(Exp. 6-30-03)

## VII.
## INSTITUTIONAL ELIGIBILITY

14. In 1992, Congress outlawed the payment of incentive compensation to recruitment representatives at proprietary schools that received Title IV, HEA Program funds. The payment of incentive compensation was banned because proprietary schools and their recruiters were exploiting students who looked to those recruiters for advice about their education. Senator Sam Nunn explained the major reason for the amendment was because proprietary schools were using commissioned recruiters to generate enrollments. Students were being exploited while the Government was being bilked of limited funds set aside to provide low – and moderate– income students with an opportunity to obtain an education In order to eliminate the conflict of interest between recruiters compensated according to their success in securing enrollments and the students who relied on such recruiters to

provide objective advice and information about their education, Congress outlawed the practice in 1992.

> Last February [1990], the Permanent Subcommittee on Investigations held two days of hearings on problems in the Title IV guaranteed student loan program. Those hearings uncovered an alarming pattern of waste, fraud and abuse in the program, particularly in regard to those loans given to students enrolled in trade and proprietary schools.
>
> At those hearings, the General Accounting Office reported that their review of the 1987 data showed that, although proprietary school students accounted for only 22 percent of the outstanding loans in the Title IV program, they produced 44 percent of all defaults.
>
> Of perhaps even greater significance, we also heard testimony that vividly demonstrated that the students for whom the loan program had been developed were being victimized themselves by unscrupulous school owners. Tens of thousands of such students failed to receive the promised training and skills from those schools and, accordingly, found themselves saddled with debt they had no way of repaying.

*Abuses In Federal Student Aid Programs: Hearing Before the Permanent Committee On Investigations of the Senate Committee On Governmental Affairs*, S. Hrg. 101-659, Pt. 2 (Statement of Sam Nunn, Chairman).

15. The Higher Education Act of 1965, Title IV, Part G, § 487, as amended, prohibits an institution that pays incentive compensation to admissions and recruitment representatives from participating in Title IV, HEA Programs. An institution must enter into a Program Participation Agreement with the Agency in

order to obtain eligibility to participate in the Title IV, HEA Programs.

> The agreement ***shall*** condition the initial and continuing eligibility of an institution to participate in a program upon compliance with the following:
>
> *   *   *
>
> (20) The institution will not provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance, except that this paragraph shall not apply to the recruitment of foreign students residing in foreign countries who are not eligible to receive Federal student assistance.

20 U.S.C. § 1094(2). The regulation implementing the statutory prohibition against paying incentive compensation to recruiters is 34 CFR § 668.14(b)(22).

**<u>A. The Program Participation Agreements ("PPA")</u>**

16. Each of the PPAs identified in ¶ 13 each contain the statutory prohibition against paying incentive compensation.

17. Execution of the PPAs was a mandatory, statutory condition for receiving Title IV, HEA Program funds. The PPA states that no participation in the Title IV, HEA Programs is allowed unless the agreement is signed. "The execution of this Agreement by the Instititution and the Secretary is a prerequisite to the

repayment of the loans to a lender in the event the student defaults on the loan. The guarantee agencies, in turn, obtain repayment of the defaulted loans from the Agency under agreements between the guarantee agencies and the Agency. In addition, the Agency subsidizes the loans by paying interest while the student is enrolled and during authorized grace periods *See* 20 U.S.C. § 1071 *et seq*.; 34 CFR Part 682.

21. In order to be an eligible borrower under FFELP, the student must be enrolled in an institution approved by the Agency to participate in Title IV, HEA Programs. The borrower may apply for a FFELP loan by completing a Free Application for Federal Student Aid ("Application") form which is then submitted to the school.

22. The Application form requires the participating school to certify the borrower's eligibility, enrollment status, the approved loan period, cost of attendance, grade level, anticipated graduation date, recommended loan amounts and recommended disbursement dates. The student loan Application form requires the genuine signature of an authorized school official with the name and title of the official and the OPE ID Number of the school.

23. After the Application is completed by both the borrower and the school, the application is submitted to the lender and is submitted to the guarantee agency.

The school's signature and OPE ID Number on each Free Application for Federal Student Aid is a requirement to obtain loans and loan guarantees under the Title IV, HEA Programs.

24. Checks must be issued by the lender under FFELP payable to the borrower and the school jointly. The signature of an authorized agent of the school is required to disburse the proceeds from FFELP loans.

25. Federal Pell Grants are offered as direct grants of student financial aid from the Agency and is referred to as a "campus based program." A student must be enrolled in an institution approved by the Agency in order to receive a federal Pell Grant. The student may apply for a Pell Grant by completing and submitting an Application to the school. The school must approve the Pell Grant, and the genuine signature of an authorized school official with the name and title of the official and the school's OPE ID Number are placed on the Application. *See* 20 U.S.C. § 1070a *et seq.*; 34 CFR Part 690.

26. Pell Grants are normally disbursed to the institution by the Agency under the direct authorization mode of payment. Under this system, the institution is allowed to draw down Pell Grant funds from an account at the Agency. The school essentially has a blank check to draw upon Agency funds that are allotted to the

institution every year based on the school's historical requirements.

27. The school enters its request for a Pell Grant disbursement electronically or on-line to a processing unit of the Agency. The last screen of the on-line Pell Grant submission form requires the school to certify that the information entered is accurate. The funds are transferred electronically to the Federal Pell Grant Account maintained by the school, which account must be used exclusively to administer funds distributed from the Agency under the Pell Grant Program.

28. In order to distribute the funds in the school's Pell Grant Account, the school must write a check to itself and enter a credit for that amount to the student's account at the school. The signature of an authorized agent of the school is required to disburse the proceeds from Federal Pell Grants received from the Agency.

29. The Federal Direct Student Loan Program (20 U.S.C. § 1087a *et seq.*; 34 CFR Part 685), the Federal Perkins Loan Program (20 U.S.C. § 1087aa *et seq.*; 34 CFR Part 674), and the Federal Supplemental Educational Opportunity Grant Program (20 U.S.C. § 1070b *et seq.*; 34 CFR Part 676) are also campus based programs under which the Agency distributes student financial aid from funds appropriated by Congress. Each of these programs requires completion of a Free Application for Federal Student Aid by both the student and the school. Each

program, moreover, has procedures in place so that disbursement of the Agency funds to program recipients requires the signature of an authorized official at the school.

## IX.
## SUMMARY OF CLAIMS

30. Beginning in 1993 through the present, Lincoln and its respective predecessor entities, paid its admissions/recruitment representatives according to an incentive salary structure and mandatory minimum quota program in violation of Title IV, HEA Program laws. Pursuant to a salary policy established by Lincoln's officers and directors, a so-called "salary" was paid to *Relators*, and to all other recruiters employed at Lincoln's campuses, that was directly tied to an enrollment quota for that recruiter. Recruiters who failed to enroll their minimum quotas were terminated. Recruiters who exceeded their minimum quotas were given raises. In addition, Lincoln's corporate office monitored the number of "leads" received individual recruiters on a daily basis. Recruiters failing to "convert" a minimum percentage of leads into enrollments were also terminated. The director of admissions at each campus in turn set enrollment quotas for the recruites at his campus. Admissions directors failing to meet campus enrollment quotas were also fired from their jobs.

31. From approximately 1993 through the present, Lincoln made claims for and has accepted Title IV, HEA Program benefits. During all such times, Lincoln compensated its admissions and recruitment representatives through the use of commissions, bonuses and other incentive compensation. 20 U.S.C. § 1094 (20), 34 CFR § 668.14(b)(22). The illegal compensation structure and quota system for recruiters was devised and actively monitored by Lincoln's corporate officers.

32. By submitting claims for student financial aid under the Title IV, HEA Programs while Defendant was violating the incentive compensation prohibitions, Defendant knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval in violation of 31 U.S.C. §§ 3729(a)(1), (a)(2) and (a)(7).

33. If the United States had been aware of Defendant's violations of 20 U.S.C. § 1094 (20) and 34 CFR § 668.14(b)(22), the United States would not have paid, or caused to be paid, any of the Title IV, HEA Program benefits requested by Lincoln. Defendant concealed their illegal activities from the United States in an effort to defraud the Agency into paying Title IV, HEA Program claims it would not, acting reasonably, have paid.

## A. Implied Certification

34. The PPAs Lincoln entered into with the Agency required Lincoln to

comply with Title IV, HEA Program laws and regulations as a condition to receiving benefits. Lincoln submitted claims the Agency while it was ineligible for payment because it paid incentive compensation to its recruiters.

35. Lincoln's submission of claims for Title IV, HEA Program benefits involve implied certifications that Defendant would abide, and has abided by, and that it will adhere, and has adhered to, all the statutes, and regulations governing the Title IV, HEA Programs.

36. The submission of claims by Lincoln falsely represented an entitlement to Title IV, HEA Program benefits that was forfeited by violating the statute, regulation and PPA terms.

**B. <u>False Certification of Compliance</u>**

37. The eligibility requirements for participating Title IV, HEA Programs provide that every institution must submit an annual compliance or "attestation" audit report to the Agency. The attestation compliance examination is required under 20 U.S.C. § 1094(c) and 34 CFR §§ 600.7(g) and 668.23(b). The attestation audits must be conducted according to the standards of the U.S. Government Accounting Office's *Government Auditing Standards*; the Statement on Standards for Attestation Engagements promulgated by the American Institute of Certified Public Accountants

("AICPA"); and the U.S. Department of Education's Office of Inspector *General Audit (Attestation) Guide of Federal Student Financial Assistance Programs at Participating Institutions* (June 1995) (hereafter "*SFA Audit/ Attestation Guide*"). *See* 34 CFR §§ 600.7(g) and 668.23(b).

38. Under the *Statement on Standards for Attestation Engagements* ("SSAE") established by the American Institute of Certified Public Accountants ("AICPA"), "[m]anagement's assertions should be bound with or accompany the practitioner's report or the assertion should be clearly stated in the practitioner's report." AT § 100.50. Lincoln's management's assertions letters were transmitted to the Government, and constitute actionable false certifications of compliance.

39. The procedure for performing an "attestation engagement" requires a letter from the company's management asserting that the institution is in compliance with the laws and regulations applicable to Title IV, HEA Programs. The assertions required in the management letter are set forth in Section II of the *SFA Audit/ Attestation Guide*. The assertion letter must begin with the language

> "[Institution] ***complied*** with the Institutional Eligibility and Participation compliance requirements listed in Section II of the ED SFA Guide."

(brackets in original)(emphasis added) *SFA Audit/Attestation Guide*, Page II-2.

40. The *SFA Audit/Attestation Guide* requires the institution to affirmatively assert in its representation letter that it has "not paid to any persons or entities any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments, financial aid to students or student retention [34 CFR 668.14(b)(22)];" (brackets in original) Page II-3, *SFA Audit/Attestation Guide.*

41. The auditor and Lincoln expressly agreed, in their engagement contract, that the auditor's attestation report would be submitted to, and relied upon by, the Agency. Specifically, the *SFA Audit/Attestation Guide* required the engagement letter between Lincoln and the IPA to include a "statement that both parties understand that ED intends to use the IPA's report to help carry out its oversight responsibilities of the Title IV programs." Page 1-5, *SFA Audit/Attestation Guide.*

42. The engagement letter contained an explicit acknowledgment by management that the report on management's letter of compliance with the laws applicable to the Title IV, HEA Programs would be used to establish and maintain the institution's eligibility to participate in the Title IV, HEA.

43. Lincoln made false certification in the management's assertion letter to its compliance auditor, that were submitted to the Agency each year as part of the institution's compliance or attestation examination. Lincoln's management assertion

letters constituted express false certification of both past and present compliance with the laws governing Title IV, HEA Programs.

44. Lincoln submitted compliance audit reports and financial statements for the years 1997 through 2001 that were received by the U.S. Department of Education on the following dates:

12-31-97 received on 7-2-98
12-31-98 received on 6-30-99
12-31-99 received on 7-3-00
12-31-00 received on 7-3-01
12-31-01 received on 7-1-02

For example, *See* Exs. 1 (Independent Accountants' Report On Management's Assertions On Compliance With Specified Requirements Applicable To the SFA Programs for 12-31-00 audit of Union, New Jersey) & Ex. 2. (Response by U.S. Department of Education).

45. The attestation function is the policing mechanism used to protect the federal Treasury. Management's letters are incorporated into and form the basis for the attestation auditor's opinions. Management's affirmative assertions of present compliance were made after Lincoln has received funds from the Title IV, HEA Programs. Lincoln falsely certified compliance with the Title IV, HEA Program laws prohibiting payment of incentive compensation to its admissions representatives in

its management assertion letters to its compliance auditor.

## C. Fraud in the Inducement

46. Lincoln fraudulently induced the Agency into paying Title IV, HEA Program benefits by entering into the PPAs described above. Lincoln "knowingly" entered into the PPAs with no intention of complying with the ban on paying incentive compensation to its recruiters. Lincoln's ongoing practices were inconsistent with the promises made in the PPAs, and indicate that Defendant had no intention of complying in the future with those requirements. The Agency relied on the assertions of compliance made in the PPAs.

## D. Materiality

47. The false statements and false certifications made by Defendant in the PPAs were material. The false statements and false certifications regarding the payment of incentive compensation to admissions representatives implicated express statutory conditions to Defendant's eligibility to participate in the Title IV, HEA Programs. A claim for payment of money from the Public Treasury contrary to the statutory appropriation is prohibited by the Appropriations Clause of the Constitution. Funds may be paid from the public fisc only as authorized by Congress. The Agency, acting reasonably, would not have allowed Lincoln to participate in the Title IV, HEA

Programs, without explicit agreement to comply with the PPA terms.

48. The false statements made by Lincoln in the management compliance letters were material. The compliance audit was required by statute. 20 U.S.C. § 1094(c). Management's false certification of compliance with the incentive compensation prohibitions implicated Lincoln's eligibility to participate in the Title IV, HEA Programs. A claim for payment of money from the Public Treasury contrary to the statutory appropriation is prohibited by the Appropriations Clause of the Constitution, which provides that funds may be paid from the public fisc only as authorized by Congress. The Agency, acting reasonably, would not have allowed Lincoln to participate in the Title IV, HEA Programs if the compliance audit opinions failed to establish that the management assertion letters had affirmatively certified compliance with the incentive compensation laws.

## X.
## DAMAGES TO THE UNITED STATES

49. Defendant submitted false claims and received substantial revenues from the United States under the Federal Family Education Loan Program ("FFELP"). 20 U.S.C. § 1071 *et seq.* Under FFELP, the Agency subsidizes interest payments on the loans during the period that the student is actively enrolled in classes and during

53. Defendant Lincoln has been consciously aware of the statutes in question at all times material hereto.

54. The prohibited remuneration to recruitment representatives described in this Complaint are part of Defendant's nationwide business strategy conceived, designed, and implemented by the managing officer and director of Lincoln. The concealment of the illegal compensation practices by the respective campuses was also conceived, designed, and directed as a matter of corporate policy and practice by Defendant. The Defendant has caused the knowing violations of the False Claims Act by all the institutions which entered into the PPAs with the Agency.

## COUNT 1
## FALSE CLAIMS ACT VIOLATION (§ 3729(a)(1))

55. Defendant Lincoln "knowingly" made and caused to be used a false record or statement to obtain payments from the United States Government and to avoid liabilities to the United States Government. Lincoln had actual knowledge of the information being provided to the United States Government; acted in deliberate ignorance of the truth or falsity of the information; or acted in reckless disregard of the truth or falsity of the information provided to the United States.

56. The United States Government has been damaged as a result of Defendant's violations of the False Claims Act.

57. As set forth in the preceding paragraphs, Defendant Lincoln "knowingly" presented, or caused to be presented, to an officer or employee of the United States Government a false or fraudulent claim for payment or approval in violation of 31 U.S.C. § 3729(a)(1), and have damaged the United States by their actions in an amount to be determined at trial.

**COUNT 2**

**FALSE CLAIMS ACT VIOLATION** (§ 3729(a)(2))

58. As set forth in the preceding paragraphs, Defendant Lincoln "knowingly" made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government in violation of 31 U.S.C. § 3729(a)(2), and have damaged the United States in an amount to be determined at trial.

**COUNT 3**

**FALSE CLAIMS ACT VIOLATION** (§ 3729(a)(7))

59. As set forth in the preceding paragraphs, Defendant Lincoln "knowingly" committed the acts described above for the purpose of concealing,

avoiding, or decreasing an obligation to pay or transmit money or property to the Government in violation of 31 U.S.C. § 3729(a)(7), and have damaged the United States in an amount to be determined at trial.

## XII.
## RELIEF REQUESTED

60. WHEREFORE, the Relator, on behalf of himself and the United States Government, pray:

(a) That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the United States has sustained because of Defendant's actions, plus a civil penalty of $5,000 - $10,000 for each action in violation of 31 U.S.C. § 3729, and the cost of this action, with interest, including the cost to the United States Government for its expenses related to this action;

(b) That the Relators be awarded all costs incurred, including reasonable attorneys' fees;

(c) That in the event that the United States Government continues to proceed with this action, the Relators be awarded an amount for bringing this action of at least 15%, but not more than 25%, of the proceeds of the action or settlement of the claim;

(d) That in the event that the United States Government does not proceed with

this action, the Relator be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall not be less that 25% nor more than 30% of the proceeds of the action or settlement;

(e) That the Relators be awarded prejudgment interest;

(f) That a trial by jury be held on all issues;

(g) That the United States Government and the Relator receive all relief, both at law and at equity, to which they may reasonably appear entitled.

**JURY DEMAND**

Plaintiff Demands a trial by jury.

Filed: Houston, Texas
Dates: September 13, 2002

LAW OFFICES OF SCOTT D. LEVY

By: ______________________________

Scott D. Levy
Bar No. 24000598
4100 Greenbriar
Houston, Texas 77098
(713) 528-5409

ATTORNEY FOR RELATORS

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above First Amended Complaint was served on counsel listed below on this 13th day of September, 2002 by U.S. Mail, postage pre-paid or by facsimile.

Thelma Quince Colbert, Esq.
Assistant U.S. Attorney
Burnett Plaza, Suite 1700
801 Cherry Street, Unit 4
Forth Worth, Texas 76102

Stacy L. Brainin, Esq.
Paul W. Searles, Esq.
Haynes And Boone, L.L.P.
901 Main Street, Suite 3100
Dallas, Texas 75202-3789
(214) 651-5000 Telephone
(214) 651-5940 Facsimile

Stanley A. Freeman, Esq.
Edith S. Marshall, Esq.
Powers Pyles Sutter & Verville PC
1875 Eye Street, NW, 12th Floor
Washington, DC 20006
(202) 466-6550 Telephone
(202) 785-1756 Facsimile